ALBANY FEDERAL SAVINGS AND LOAN ASSOCIATION
*v.* HENDERSON *et al.*

No. 15199. September 10, 1945. Rehearing denied November 19, 1945.

84

92

*Bennet, Peacock & Perry,* for plaintiff in error.

*Farkas & Burt* and *James V. Davis,* contra.

BELL, Chief Justice. ■ This is the second appearance of this case. Although the bill of exceptions refers to exceptions pendente lite complaining of orders overruling demurrers, the only such exceptions to be found in the record are those that were certified on March 25, 1943, being the same exceptions pendente lite that were sent up as a part of the former record, and that were considered in the former decision. *Albany Federal Savings & Loan Association* v. *Henderson,* 198 *Ga.* 116 (31 S. E. 2d, 20). The petition was amended in material respects in September, 1944, after return of the case to the trial court, and there was no subsequent demurrer or renewal of demurrer to the petition as thus amended. In the circumstances, no ruling on demurrer is now before us for review; the exceptions pendente lite having spent their force, and nothing further having been urged by demurrer. *Morris* v. *Duncan,* 126 *Ga.* 467 (3) (54 S. E. 1045, 115 Am. St. R. 105); *Williams Realty & Loan Co.* v. *Simmons,* 188 *Ga.* 184 (4) (3 S. E. 2d, 580); *Livingston* v. *Barnett,* 193 *Ga.* 640 (1) (19 S. E. 2d, 385).

■ The principal witness for the plaintiff was his father, Albert Henderson Sr., while the principal witness for the defendant was Leo Leader, secretary-treasurer of Albany Federal Savings and Loan Association. Both testified to facts and circumstances surrounding the execution of the loan contract and as to various matters following its execution. At the conclusion of the evidence, counsel for the defendant moved to exclude the testimony of the witness Henderson, on the ground that it was an effort to contradict and vary the terms of the written contract, whereupon counsel for the plaintiff moved to exclude "all oral testimony of Mr. Leo Leader prior to the execution and entering into the loan contract that varies or contradicts the terms of the written contract." The court ruled, and instructed the jury, as

follows: "Gentlemen, the court on motion of counsel has excluded from your consideration all of the testimony of Mr. Henderson, that is, the oral testimony with reference to the contract in this case prior to its execution, and the oral testimony of Mr. Leader with reference to the terms of the contract prior to the time it was entered into. That does not apply to the oral testimony subsequent to the time of the execution of the contract, but the ruling is that all of the testimony of both these witnesses prior to the time of the execution of the contract as to what the contract was, is excluded from your consideration."

In part B of ground 4 of the motion for a new trial, the movant complained that the ruling of the court excluding "the oral testimony of Mr. Leader with reference to the terms of the contract prior to the time it was entered into," as stated above, was erroneous and prejudicial in that, as the movant contends, none of the testimony of Leader was in conflict with the written instrument. "Movant contends that the testimony of said Leo Leader, in substance, that under the terms of the written contract it was intended to loan the sum of $8000 for the purpose of projecting a four-unit apartment in front of the Godwin home, leaving such part of the Godwin home as was not used in the construction of said apartment as living quarters for said Albert Henderson and his family, and that an additional $8000 was to be advanced for the construction of a four-unit apartment to the rear of the Godwin home facing on Flint Street, was not in conflict with the terms of said written instrument, but, on the contrary, movant contends that said testimony was in accord with the terms of said contract and the plans approved in connection therewith (Exhibits 8 and 9 of the brief of evidence, and attached hereto as Exhibits A and B). Movant contends that the ruling of the trial judge impressed the jury to the effect that the court was of the opinion that the testimony of said Leo Leader was in conflict with said written instrument, and movant contends that said ruling was erroneous and prejudicial."

Whether or not the foregoing complaint indicates with sufficient certainty what particular testimony the judge excluded or intended to exclude by the ruling quoted, we think that the part of the testimony therein set forth (but not alleged in terms to have been excluded) contradicted the provisions of the written instrument as

to converting or changing the Godwin residence into a four-unit apartment, with living quarters in the rear, and accordingly we hold that this assignment of error is without merit. See references to Exhibits 8 and 9 in division 7, infra.

▮ As shown in the statement, the Godwin tract consisted of a strip across the northern parts of city lots 50, 52, 54, and the entire east half of lot 56, all, according to their form and dimensions, fronting north on Flint Street, although the residence situated thereon fronted east, toward Jackson Street. In ground 5 of the motion for a new trial, the movant complained because the court allowed the witness Henderson to testify that the rear of lot 54 is "nearly back of the city auditorium," and that, if a house were built on the rear of lot 54, it would be facing an alley, and would be on the property of a Mrs. Williams; the movant having objected to this testimony on the ground that "this contract provides that a four-unit apartment was to be built on the rear of lot 54 and 56, and this witness is undertaking to prove to the jury that this is an impossibility, and the Supreme Court has held that they are bound by the contract."

This ground of the motion for a new trial shows no cause for a reversal. The construction of the contract was a matter for the court, but it was permissible to prove the physical facts and circumstances. "The surrounding circumstances are always proper subjects of proof to aid in the construction of contracts." Code, § 38-505. See also Code, § 20-704 (1); *Andrews* v. *Stulb & Vorhauer*, 145 *Ga.* 826 (1) (90 S. E. 59). The defendant contended that the phrase, "rear of lot 54," meant "in the rear of the Godwin home," as was stated by this court in its former decision. As a matter of fact, the testimony, whether so intended or not, actually tended to support this contention, since it showed that, if a house were built on the actual or geographical rear of lot 54, it would be built on the land of a third person, thus illustrating that any construction of the contract other than that claimed by the defendant would be unreasonable. In other words, the testimony tended to help rather than hurt the objecting party. *Slater* v. *Savannah Sugar Refining Corporation*, 28 *Ga. App.* 280 (1) (110 S. E. 759); *Ætna Insurance Co.* v. *Martin*, 64 *Ga. App.* 789, 794 (14 S. E. 2d, 161). Furthermore, even if it should have been excluded, any possible error in admitting it was cured by the

judge's charge to the jury, wherein he plainly sustained the defendant's contention as to the meaning of the written agreement with respect to location of the proposed new four-unit apartment. *Verdery* v. *Savannah &c. Railway Co.,* 82 *Ga.* 675 (2) (9 S. E. 1133); *Phœnix Insurance Co.* v. *Gray,* 107 *Ga.* 110 (3) (32 S. E. 948); *Norris* v. *Richardson,* 151 *Ga.* 31 (1) (105 S. E. 493); *Cozart* v. *Johnson,* 181 *Ga.* 337 (2) (182 S. E. 502).

■ In special ground 7, the movant assigned error upon the ruling of the court admitting in evidence the deed of March 13, 1943, called by the plaintiff "a reformed deed," over the objection that "the assignment in this deed after the suit was started would add nothing to their right." Substantially the same objection was made to the introduction of the identical deed on the former trial, but the ground was not argued or insisted upon in this court, and was treated as abandoned. See division 7 of the former decision. Accordingly, although the judgment refusing a new trial was reversed on other grounds, the ruling as to that particular matter stood affirmed because of the abandonment of the assignment of error based thereon, and the present exception relating to the same matter is necessarily controlled adversely to the defendant by the law of the case.

■ For the purpose of this and the division next following, reference is made to the entire charge on damages, as quoted in the preceding statement.

In ground 6 of the motion for a new trial, several attacks were made on the charge as to damages, which attacks were contained in various divisions and subdivisions of this ground, as hereinafter indicated. Considering these attacks as if they were separate and distinct grounds of the motion, we will deal first with ground 6 (1) A.

In that ground, the movant contended that so much of the charge as undertook to segregate the alleged damages into items 1 and 2 was erroneous because it was not in keeping with the pleadings and the evidence, and for other reasons. In order that this ground may be better understood, it may be recalled that the allegations as to damages were substantially as follows: In his petition as amended, the plaintiff alleged that at the time the work was stopped he had expended approximately $7500 for improvements and additions to the said property as contemplated

by the parties, and he claimed damages of $7500, "representing the difference in the value of material used and work done on said building in contemplation of the parties and the value of said improvements to the property, and in addition thereto $5000, representing the difference in the market value of the Godwin home located on said property before construction began and after construction was stopped;" it being also alleged, however, that by reason of the refusal of the plaintiff to furnish further money for continuing the work on said property, the expenditures made for the additions and improvements were of no value to the owner of said property.

In the former decision, it was held that the damages so alleged were such as the jury might reasonably find to have been in contemplation of the parties at the time the contract was entered into.

The judge, in charging the jury, stated that there were two items of damages claimed by the plaintiff that would be referred to in the charge as items 1 and 2. He further stated that, under item 1, the plaintiff claimed damages for "depreciation in the market value of the Godwin home located on the property in question and the money spent in changing and altering said house as contemplated by the parties by reason of the alleged breach of the contract by the defendant." He charged also that, "If there has been a breach of contract and if there has been a depreciation in the market value, the amount of depreciation in the market value thereof plus the amount rightfully and properly spent on the incompleted changes and improvements thereon as contemplated by the parties would be the amount the plaintiff would be entitled to recover on this item." Later, he charged in reference to item 2, stating as to this item, "the plaintiff claims that at the time the loan was made it was understood that additional improvements would be placed upon the property in question, that is the Godwin lot, consisting of four apartments." As to the same item, that is, item 2, he further charged among other things: "If you believe the improvements placed upon said property by reason of the expenditures increased the value of the property less than the amount rightfully and properly expended, then under this item of damage the plaintiff would be entitled to recover the difference between the amount rightfully and properly expended on the improvements and the value that you find the incompleted improve-

ments to be to the property on which they are located. If you believe these improvements increased the value of the property in an amount equal to or greater than the amount expended by the plaintiff in the construction of same, then it would be your duty to find in favor of the defendant on this item, number two."

It was contended that the charge thus undertook to divide the claim for damages into two distinct parts, one relating to the existing residence known as the Godwin home, and the other relating to the four new apartments as begun, but as left in an unfinished state, in front of such residence; that there were no pleadings or evidence to warrant such division or segregation; and that the charge was also confusing and prejudicial, because in determining the issues both as to depreciation in the value of the Godwin home (item 1), and as to the value of the incompleted improvements "to the property" (item 2), the entire Godwin home place, that is, the residence and the entire tract of land upon which it is situated, with all improvements, should have been considered as a whole, and that such issues could not be properly and fairly determined by considering the various elements separately, which, as the movant insists, the jury were required to do under the charge.

There is no merit in the contention that segregation into items 1 and 2 was not in accordance with the pleadings. The petition as amended, having alleged expenditure of approximately $7500 for "improvements and additions," was broad enough to cover amounts expended both on changes and alterations within the residence itself, and on partial construction of the new four-unit apartment, in front of such residence. It is true that there were no allegations as to amounts separately expended on each, but a charge which directed the jury to consider separate amounts was easily within the scope of the general allegations stated, and altogether consistent therewith.

Nor can we sustain the contention that there was no evidence as to separate expenditures. Henderson testified that he "actually spent $8500 or $9000 there," but that no separate accounts were kept "because it was all one job." The test was not the precise amount expended, but the amount rightfully and properly expended, as stated by the judge in his charge. U. S. v. Behan, 110 U. S. 338 (4 Sup. Ct. Rep. 81, 28 L. ed. 168). As to that

issue, E. L. Winslett, sworn as a witness for the plaintiff, testified: "My trade is contractor and builder. I have been in that business six or seven years. I had occasion to go around and look at the old Godwin home place. I made an investigation of the property and an estimate of how much money was spent, in my opinion, in remodeling the home place. My estimate was around $5000. I made an estimate of the money spent on the new improvements, which estimate was around $3000."

On cross-examination, the witness testified: "I could not estimate how many face brick he had used around there. I did know at the time how many concrete blocks he has used, but I don't recall now. When I went around there, I would say, taking into consideration the fact that he had used some face brick on the old house, that he had used 25,000 or 30,000 face brick." "Q. Did you estimate how many floor joists he had used?" "A. He had finished five or six rooms in there." "Q. Did you make an estimate of the materials he had used in coming to your conclusions, or did you just look at the building and say what you thought it cost?" "A. We didn't go through all of it. I made no estimate of how much floor joists he had used, or brick, or anything. I was not familiar with this property before the work started."

Notwithstanding the opinion of this witness as to amounts expended may have been weakened somewhat on cross-examination, we cannot say that it was entirely without probative value. Code, §§ 38-1708, 38-1709; *Shaw* v. *Jones, Newton & Co.*, 133 *Ga.* 446 (3) (66 S. E. 240). Nor, considering the entire evidence in the case, including the evidence as to the number and dimensions of the rooms in the Godwin residence and other facts regarding it, and in view of the peculiar function of the jury with respect to questions of value and similar matters, can we say that there was no evidence to support the charge as to separate amounts (items 1 and 2) rightfully and properly expended. *Baker* v. *Richmond City Mill Works*, 105 *Ga.* 225, 227 (31 S. E. 426); *Jennings* v. *Stripling*, 127 *Ga.* 778 (3) (56 S. E. 1026).

There is no merit in the contention that in the part of the charge submitting the question of depreciation in the value of the Godwin home or dwelling house, and the issues as to the amounts by which the improvements and additions may have in-

creased the value of the property, the Godwin home place was not treated as a whole, but was divided into separate parts, as (1) the dwelling house with the land only on which it is situated, and (2) the four new apartments as begun in front of such residence with the land on which they alone are located.

While the charge did, in more than one instance, refer to the Godwin home as "said house," it followed the petition in this respect; the allegations as to the difference in market value of "the Godwin Home located on said property" clearly referring to the Godwin "house." There was nothing in the charge that tended to require the jury to consider the house only, or the house with less than the entire Godwin lot, in determining depreciation in market value or other issue; but, in determining all issues, they were left free to consider the entire Godwin Home Place as a whole.

The charge as to item 2 referred in the opening sentence to "the Godwin lot," plainly meaning the entire tract known as the Godwin Home Place, and the word "property" in the latter excerpts submitting the issue as to the value of the incompleted improvements "to the property," or "to the property on which they are located," was evidently intended to have the same meaning, that is, the entire Godwin tract.

None of the complaints as to segregation of damages shows error. "If the charge is sufficiently clear as to be understood by jurors of ordinary capacity and understanding, this is all that is required, and such appears to us to be the case as to the charge of the court in this case." *Georgia Railroad* v. *Thomas, 73 Ga.* 350, 356.

■ All of the remaining assignments of error on the judge's charge will be considered and determined in this division.

In ground 6 (1) B, the movant contended that the charge as to damages was erroneous because it did not require the jury, in estimating the damages, to determine the value of the Godwin Home immediately after the breach of the contract, but authorized them to find damages based on the value of the property at any time up to the trial. In the former decision, it was stated, "a jury would be authorized to find that, in the unfinished state of the improvements and additions to the property, the petitioner sustained damages at the moment the lender refused to advance the remainder of the loan." 198 *Ga.* 116 (3), 138.

Before giving in charge any rule as to damages under either item, the judge stated to the jury that he would use the term "market value" several times in his charge with reference to items 1 and 2. He then gave a rather lengthy definition or explanation of the term, in which he referred to market value "at the time when the work on the improvements was stopped," and used other expressions of the same import with respect to the time element. In view of these specific instructions as to market value, the charge as a whole was not reasonably subject to the criticism that it authorized the jury to find damages based on value or values at any time up to the trial, notwithstanding there were certain later expressions, which, if they had stood alone, might have been susceptible of that construction. See, in this connection, *Seaboard Air-Line Railway* v. *Bishop*, 132 *Ga.* 37 (2) (63 S. E. 785); *High Shoals Manufacturing Co.* v. *Price*, 136 *Ga.* 22 (4) (70 S. E. 641); *O'Donnelly* v. *Stapler*, 34 *Ga. App.* 637 (5) (131 S. E. 91); *Mitchell* v. *Mullen*, 45 *Ga. App.* 282 (5) (164 S. E. 278).

Nor was the charge subject to the criticism contained in ground 6 (2) A, that it authorized a recovery of damages without reference to whether they were shown to have resulted from a breach of the contract or from some other cause not inherent in the contract or in the contemplation of the parties; the judge having prefaced his instructions as to the measure of damages with the statement, "if you find there was a breach of the contract on the part of the defendant, then these rules will apply, and then only, provided you find that damages resulted from the alleged breach," and all remaining instructions being consistent therewith.

In ground 6 (2) B, it was insisted that the charge was erroneous because it authorized the jury to consider as a part of the amount expended, approximately $2000 which Albert Henderson Sr., father of the plaintiff, and the contractor, testified that he had expended from his own personal funds.

There is no merit in this contention. The amount so expended could have been considered by the jury either as a gift or as a loan to the plaintiff by his father, and in either view it was proper for the jury to consider it in determining the amount rightfully and properly expended by the plaintiff, within the purview of the contract.

In ground 6 (2) C, it was contended that the charge was er-

roneous, because it authorized the jury to include in their verdict the value of certain materials which had been purchased for use in making such improvements by the plaintiff, but which were not so used, in that they either remained on hand, or had been lost or sold, and also because it permitted a recovery based on the value of materials used on said construction work without allowing credit to the defendant for the "salvage value of such materials."

We cannot agree that the charge, when considered as a whole and reasonably construed, allowed the jury to consider the value of any materials that were not actually used in constructing the incompleted improvements and additions, especially in view of the instructions as to amounts "properly and rightfully" expended.

As to salvage, any credit to which the defendant might have been entitled on this account would have fallen under the principle that one who is injured by the breach of a contract is bound to lessen the damages, so far as practicable, by the use of ordinary care and diligence, and it was therefore a matter for defense. There being no pleadings or evidence as to salvage value, the charge as given was not erroneous for failure to mention salvage or salvage credit. See, in this connection, Code, § 20-1410; *Southern Railway Co.* v. *Cunningham,* 123 *Ga.* 90 (7) (50 S. E. 979); *Southern Railway Co.* v. *Williams,* 139 *Ga.* 339 (3b) (77 S. E. 168); *Southern Upholstering Co.* v. *Lieberman,* 27 *Ga. App.* 703 (5) (109 S. E. 509); *Branon* v. *Ellbee Pictures Corporation,* 42 *Ga. App.* 293 (2) (155 S. E. 923).

Without further enumeration, we may say that the exceptions to the charge other than those hereinbefore specifically mentioned are considered to be without merit, in view of what has been ruled above and the ruling in the former decision as to the measure of damages.

■ Finally, we come to the general grounds, involving the question as to whether the evidence was sufficient to support the verdict.

It is contended that, since it appears that Albert Henderson Sr., was the general agent of the plaintiff in all of the transactions about which he testified, his testimony should be construed most strongly against the plaintiff, just as though the witness himself had been the party plaintiff. Compare *Baggett* v. *Trulock,* 77

*Ga.* 369 (3 S. E. 162) ; *Nalley Land and Investment Co.* v. *Merchants and Planters Bank,* 187 *Ga.* 142 (6) (199 S. E. 815); *Palmer Murphy Co.* v. *Fruit Haven Farm,* 34 *Ga. App.* 153 (128 S. E. 693). It is unnecessary to rule on this contention, since, even assuming that the testimony should be so construed, and hereinafter so treating it, we cannot say that the verdict was unsupported.

The loan contract as finally expressed in the "Loan Settlement Statement," and the two notes for $8000 each, provided for an immediate and unconditional loan of $8000, to be used for the purpose of converting the Godwin home into a four-unit apartment, with living quarters in the rear, and a second or additional loan in the same amount, to be used for the construction of a four-unit apartment "on lot 56 and the rear of No. 54," provided plans and specifications therefor were submitted to and approved by the Association. It appeared on the former trial, as it did on the trial now under review, that, at the time the defendant discontinued the advancements, considerable work had been done both inside and outside the old Godwin residence. The work that had been done on the outside consisted of the partial construction of a new four-unit apartment, which was being built in front of the old residence and fronting on Jackson Street, which location was not in accordance with the provision in the written agreement as to building such a structure on lot No. 56 and the rear of lot 54. Nevertheless, on the former trial, Henderson was permitted to testify as to a verbal agreement to lend an entire sum of $16,000 for improvements on the Godwin home, and for the construction of a new four-unit apartment in front of the same, and it was held by this court that such testimony varied and contradicted the terms of the written contract as to the location of the proposed new structure and the approval of plans and specifications therefor as a condition precedent to an advancement of the second loan of $8000. The plaintiff thereafter amended his petition by alleging a mutual departure from the written terms of the contract after it was executed, such departure consisting in erecting the four-unit apartment in front of the Godwin home, instead of erecting the same on lot No. 56 and the rear of No. 54, and by further alleging waiver and estoppel.

So, the important question now is whether the plaintiff was

entitled to recover upon the theory of a mutual departure, or other theory alleged in such amendment.

On the first trial, Henderson testified in reference to three drawings, now exhibits 8, 9, and 10 in the brief of evidence; exhibits 8 and 9 illustrating the outside appearances of the old residence with a proposed extension or addition in front, and exhibit 10 showing floor plans for a four-unit apartment. He testified on that trial that all of these drawings or plans had been agreed upon at the time the written contract was executed on August 25, 1941. Upon the second trial, he testified: That he was mistaken when he stated, on the former trial, that exhibit 10 had been so agreed upon; that as a matter of fact these floor or "working plans" (exhibit 10) were not even drawn until a week or ten days after the loan contract was made; and that they were then approved by Mr. Leader, representing the Association. "As to what I did after August 25th—as soon as the contract was signed, I went to making measurements to make a working plan to see what we could do, and we found in a few days where we could add this front portion to the new house and make a back porch to the old house by combining them, and we made a plan of that and carried it to Mr. Leader, and he approved it and said, 'Go ahead and finish it.' Those plans are in court. That is the plan (referring to exhibit 10). I submitted them to Mr. Leader. According to those plans, the new apartment faces Jackson Street. That is the way it is now. Mr. Leader visited the job. He did not make any complaint about the location. He did not say it was in the wrong place. He said everything was O. K. He advanced me about $7100 or $7200. After that he said I didn't have any more coming. He would not give me any more money."

As to exhibits 8 and 9, he testified, "they are simply a picture, there was no working data to them and no man living could build a house by them. Plaintiff's No. 8 and 9 were in Mr. Leader's office at the time the contract was signed." "Q. But you say they had not been agreed on at the time it was signed?" "A. No working plan had been agreed on."

The witness further testified that his wife had assisted in drawing the plans for the four new apartments, and she herself testified: "I made the first sketch of them. These plans were made after August 25, 1941, because we didn't know whether we were

going to get the money until that date. That was the day Mr. Studstill was here and had lunch with us, and they were made afterwards. They were made from five to ten days after Studstill left on August 25, I don't remember exactly how long it was."

Mr. Leader contradicted the foregoing evidence of Mr. and Mrs. Henderson, testifying that exhibit 10 was submitted and agreed upon at the time the loan contract was executed; but that it represented a part of the work for which the first $8000 was loaned, and was not accepted or approved as fulfilling the conditions of the second loan. There were numerous other conflicts between the testimony of Leader and Henderson, which of course were issues for the jury. It appeared that Leader visited the premises frequently as the work progressed, and made no objection as to location or as to plans or specifications.

The testimony of Henderson cannot be laid aside as a matter of law because of the conflict with what he testified on the former trial as to exhibit 10. In view of his testimony that he had made a mistake on the former trial, it was a question for the jury as to whether they would believe his testimony on the same point as given on the second trial. *Scott* v. *Powell Paving Co.*, 43 *Ga. App.* 705 (2) (159 S. E. 895); *Cook* v. *Attapulgus Clay Co.*, 52 *Ga. App.* 610 (1) (184 S. E. 334).

Nor was the testimony of Henderson to the effect that no damage accrued immediately upon the breach of the contract, and that he had stated to Mr. Leader soon after the suit was filed that no damage had been sustained at that time, conclusive against the plaintiff on the issue as to damages, the witness having further testified: "I did not contemplate that if he did not let me have the money I could not get it anywhere else;" also: "When I say I suffered no damages on the day they quit furnishing me money, I meant that if I could have gotten the money elsewhere I would have suffered no damages. I could have gone on with the work."

It appears from this testimony that the witness did not mean to concede that there was no liability, albeit he may have confused the legal concept as to injury from breach, with the duty of diligence to lessen or overcome the damages sustained. *Albany Federal Savings and Loan Association* v. *Henderson*, 198 *Ga.* 116, 138 (31 S. E. 2d, 20), and see also, in this connection, *Huger* v. *Cunningham*, 126 *Ga.* 684 (4) (56 S. E. 64).

On September 1, 1941, Albert Henderson signed a letter addressed to Leo Leader, outlining the changes and additions that he proposed to make for the sum of $8000. This letter may have contained some statements that were inconsistent with the testimony of Henderson as given upon the trial, but he undertook to explain it as being consistent according to his construction of it. It was no part of the contract, but at most was a mere admission subsequently made, and was subject to explanation. Accordingly, this letter went only to credibility, and did not absolutely require a verdict in favor of the defendant. *Phœnix Insurance Co.* v. *Gray,* 113 *Ga.* 424 (2) (38 S. E. 992); *Mims* v. *Jones,* 135 *Ga.* 541 (1) (69 S. E. 824); *United States Fidelity and Guaranty Co.* v. *Clarke,* 187 *Ga.* 774 (3) (2 S. E. 2d, 608); *Bailey* v. *Warlick,* 196 *Ga.* 642 (2), 647 (27 S. E. 2d, 322).

Henderson testified that there was never any real agreement to build a new four-unit apartment on lot 56 and the rear of lot 54, or in the rear of the Godwin Home Place—"There was a written contract to that effect but none as I understood it. The written contract might show that but that was not my understanding of it." He several times testified that the wording of the contract was wrong as to the location of the proposed new apartments. This, however, would not prevent a mutual departure from the terms of the written agreement, or a recovery based upon that theory. Manifestly the parties could, by subsequent agreement or conduct, disregard or modify a written stipulation that did not express their actual agreement, just as completely and effectually as they might do with respect to one that did fully and correctly express such intention.

There was no direct or express testimony to the effect that Henderson ever demanded an advancement of any money under the second loan, or that he ever stated to Leader in specific terms that the proposed new four-unit apartment was being constructed in contemplation of the agreement as to that loan. Henderson testified: "He knew I had enough money to build those two apartments if they had kept furnishing it." "During the time that I went down there and when construction was going on on the apartment and after that, I don't think I ever demanded of Mr. Leader the other $8000 as represented by the second note, but I told him plainly that I could not finish the apartments without

more money, and he said I didn't have any more coming to me, and I asked him why, and he hasn't answered me yet."

With respect to the change in location, Henderson, referring to exhibit 10, testified: "I discussed those plans with Mr. Leader when I took them back, and I went ahead on them. If I had completed those plans, I would have had eight apartments there." "You understood me to say that I went down there first and had an understanding with Mr. Leader, and the work was to go on simultaneously." "I say these plans show the four new apartments facing Jackson Street. And I say I discussed it with Mr. Leader. I would not have gone ahead with them if I had not had an agreement with him and his approval of the plans." "At the time the contract was signed no plans were agreed on at all. A week or ten days after the contract was signed on August 25, that (referring to exhibit 10) was presented and agreed on. That shows it on Jackson Street. It shows the back end of the new house connecting with the front of the old house. You hand me the loan agreement which is exhibit No. 2 (referring to that exhibit, hereto attached). The contract as it was written was changed when I went to Mr. Leader with the final plans on which the building was to be built. When I say the final plans, I mean these plans here (indicating). I mean exhibit No. 10. It was a week or ten days after the signing of the contract before exhibit No. 10 was exhibited to Mr. Leader." "As to how it was changed—when I went to Mr. Leader with those plans, they were completed and which plans were approved. Those plans are for the front of the Godwin Home facing Jackson Street, and this contract states it was to be built on the rear of lot No. 54 and No. 56."

It is argued for the defendant that, if the evidence shows any departure at all from the terms of the written contract, it was a departure from the original plans as to changes and alterations to be made inside the existing Godwin residence, and was not a departure with respect to the location of the proposed new four-unit apartment. Under the testimony quoted, considered with the other facts and circumstances of the case, the jury were authorized to find that there was a departure as to the latter structure, and that the agreement as to the second loan, though at first conditional, was rendered unconditional by subsequent agreement and conduct of the parties; also, that there was a breach of

the contract, as alleged, as to advancing money under that loan. "Parol evidence shall be admissible to rebut an equity, to discharge the entire contract, to provide a new ' and distinct subsequent agreement, to enlarge the time, or change the place of performance." Code, § 38-507. See also Code, § 20-116; *Eaves & Collins* v. *Cherokee Iron Co.,* 73 *Ga.* 459 (2); *Bearden Mercantile Co.* v. *Madison Oil Co.,* 128 *Ga.* 694 (58 S. E. 200); *Cottle* v. *Tomlinson,* 192 *Ga.* 704 (2) (16 S. E. 2d, 555); *Southern Savings Bank* v. *Dickey,* 58 *Ga. App.* 718, 722 (199 S. E. 546).

While, as we have indicated, the evidence may not have disclosed any express subsequent agreement describing the proposed new four-unit apartment by name and purporting in specific language to change the location from that stated in the contract, yet an agreement to that effect could be shown by circumstantial as well as direct evidence.

Exhibits 8 and 9 were not signed by the parties, nor were they in any way made a part of the written contract. Being nothing more than contemporaneous negotiations, they could not by themselves vary the agreement as finally reduced to writing; and, so far as they may have indicated or tended to indicate that the first loan of $8000 would be used to build a new four-unit apartment as an annex or addition to the existing residence and in front of it, they were in conflict with the stipulation in the loan-settlement statement that the first loan would be advanced as the work progressed "on the change of the Godwin Home into a four-unit apartment." *Buffington* v. *Bank of College Park,* 157 *Ga.* 570 (2) (122 S. E. 50); *Keiley* v. *Citizens Savings Bank & Trust Co.,* 173 *Ga.* 11 (1) (159 S. E. 527); *Carr* v. *Augusta Grocery Co.,* 183 *Ga.* 346 (1) (188 S. E. 531); *Taylor* v. *Board of Trustees of Glenlock Public School,* 185 *Ga.* 61 (1) (194 S. E. 169); *Ingram* v. *Smith,* 62 *Ga. App.* 335 (3) (7 S. E. 2d, 922); *Bryant* v. *Hayes,* 66 *Ga. App.* 221, 222 (17 S. E. 2d, 765); and see especially *Albany Federal Savings and Loan Association* v. *Henderson,* 198 *Ga.* 116 (6), 143.

It is true that the application for the loan, besides stating that the Godwin home was to be "converted into a four-unit apartment," described the house as "Home & 4 Units," yet the ultimate contract was contained in the loan-settlement statement; and even construing both together, although the latter would control

in case of conflict, we do not think that it could be reasonably said that the written agreement as to the first loan contemplated that the proceeds of the loan would be used for the construction of anything as an annex or projection in front of the Godwin residence as it then existed. *Augusta Land Co.* v. *Augusta Railway &c. Co.*, 140 *Ga.* 519 (1) (79 S. E. 138); *Rigdon* v. *Barfield,* 194 *Ga.* 77 (1) (20 S. E. 2d, 587); *Caddick Milling Co.* v. *Moultrie Grocery Co.*, 22 *Ga. App.* 524 (2) (96 S. E. 583).

Accordingly, the evidence authorized a finding that the four new apartments that were begun and partially constructed as an annex and projection in front of such residence did not correspond with anything contemplated by the agreement as to the first loan, but did correspond with what was contemplated by the agreement as to the second loan, except as to location; and these were material circumstances which the jury were authorized to consider in determining the issues involved.

This is the second verdict in favor of the plaintiff. The trial judge in the exercise of his discretionary power declined to disturb it. The question here is not whether the verdict may, in the opinion of this court, be contrary to the weight of the evidence, but is whether there was any substantial evidence to sustain it.

The evidence was sufficient to support the verdict as to all issues, including the amount of damages, and it was not error to refuse a new trial.

*Judgment affirmed.* *All the Justices concur, except Duckworth, J., who dissents.*

Duckworth, Justice, dissenting. The sole basis upon which recovery was sought and obtained was an alleged breach of that portion of a written contract comprising an alleged mutual verbal departure. Unless the original contract has been modified by the alleged mutual departure, then the petitioner, in view of the former decision by this court in *Albany Federal &c. Assn.* v. *Henderson,* 198 *Ga.* 116 (31 S. E. 2d, 20), would have no case, and no valid judgment in his favor could be rendered. The general contract between the parties comprises a written application for a loan, a security deed, two notes for $8000 each, and a loan-settlement statement. The alleged departure, upon which the petitioner's entire case must rest, is petitioner's exhibit 10, which un-

der the testimony of the petitioner's .father and general agent, who has handled the entire matter.for the petitioner, is nothing more or less than a floor plan or working plan of the identical structures represented by exhibits 8 and 9 which, according to the undisputed evidence, were before the parties and were agreed upon by them at the time the loan was closed on August 25, 1941. The fallacy, as I see it, in the petitioner's pleadings, his evidence, and the majority opinion of this court lies in the fact that the original contract is treated as a single and inseparable unit, whereas it is obvious that the contract contains separate, independent, and complete clauses or contracts. This appears beyond any reasonable doubt when it is observed that in one portion of the general contract there is a provision for an unconditional loan of $8000 represented by a note, the proceeds from which were, under the terms of the contract, made available to the borrower immediately upon the execution of the contract, while another portion of the contract provides for a note for $8000 conditioned upon the approval by the lender of plans and specifications for the erection of a four-unit apartment on lots 54 and 56. Is it not very plain indeed that any alteration or departure from the terms and provisions of the contract relating to the first $8000 note will in no wise touch or alter the terms and conditions of the contract that relate solely to the second or conditional note, or vice versa? It is submitted that regardless of what use is made of the proceeds of the first loan, whether it be for the erection of a structure in front of the Godwin home, as was done by the petitioner, or for alterations exclusively inside of the Godwin home, the other portion of the general contract relating to the conditional $8000 loan remains as written, unaltered and unaffected. What is the mutual departure upon which this suit is based? Mr. Henderson, the father and general agent of the petitioner, in his testimony gives the only answer to this question to be found in the record. At page 71 is the following excerpt of his testimony: "Now, the plaintiff's exhibit No. 10 is what might be known as a floor plan. I referred to it as a working plan. I say that exhibit is the exhibit which I worked out after the contract was signed and which I brought to Mr. Leader's office a week or ten days after the contract was executed. As to whether that is the only change that was made in any of these plans, that is all I know of or can think

of right now. . . It does not change the location [as shown by petitioners' exhibits 8 and 9], only the front part of the house is sitting back about two feet. . . I say if any change was made the only change that was made was made in the floor plan." This same witness testified that the petitioner's exhibits 8 and 9 were pictures of the structures to be erected and as they would appear when completed, and represent four new apartments in front of the Godwin home and four apartments within the Godwin home, that they were in Mr. Leader's office at the time the contract was signed, that they were agreed upon at the time, and represent what the petitioner was going to do under the contract. Thus it is undeniable that under the evidence in this case the only thing which the petitioner contends was a departure from the original contract is the agreement of the parties to exhibit 10, which is nothing more or less than the floor plan of the structure represented by exhibits 8 and 9 to which the parties had agreed simultaneously with the execution of the contract. This exhibit admittedly makes no attempt to fix the location. Therefore, by agreeing to it there is no semblance of an agreement to change the location of the four-unit apartment which the contract requires to be located on lots 54 and 56. How then can it be said that by agreeing to exhibit 10 the parties mutually agreed to alter the clause of the contract relating to the second or conditional note for $8000? Instead of there being evidence, circumstantial or otherwise, to authorize a finding of, or to intimate, a mutual intention of the parties to apply the proceeds from the conditional loan to the erection of the structure represented by exhibit 10, there is positive proof that neither party intended such. This proof is found in a letter addressed to the lender and signed by the general agent of the petitioner, dated September 1, 1941, and reading as follows: "For the sum of $8000 I propose to make the following changes and additions to that property known as the Godwin Home Place, corner of Jackson and Flint Streets, being No. 229 Jackson Street, Albany, Ga., as follows: Build 4 separate apartments in front of the present structure, each one complete with separate bath, kitchen, living room, dinette, 2 bedrooms. I propose to change the rear of the present structure so as to make living quarters of 8 rooms, being 4 rooms downstairs and 4 rooms upstairs; 1 bath upstairs; toilet and lavatory downstairs; entrance

to be from Flint Street." The uncontradicted testimony at the trial shows that the substance of this letter was stated verbally to the lender, and the lender stated that, while he and the borrower knew that such was the opinion of the borrower, others did not know it, and he requested that the statement be reduced to writing in the form of a letter, and thereupon Mr. Leader wrote the letter as dictated by the petitioner's general agent. This letter states that the separate four-unit apartment in front of the Godwin home and certain alterations in the Godwin home would be completed with the sum of $8000 (not $16,000). In the face of this express intention of both parties, which is not and can not be denied, this suit claims, the jury found, and the majority of this court approved that finding, that the parties intended to use $16,000 instead of $8000, and all of this despite the fact that the undisputed evidence shows that neither party to the contract ever at any time as much as mentioned to the other the conditional $8000 note, the proposed four-unit apartment to be erected with the proceeds of that note on lots 54 and 56 or the approval by the lender of the plans and specifications for such structure. Admittedly the only funds ever made available to the borrower were the proceeds from the unconditional note, and it was with these funds and these alone that the structures begun by the petitioner were partially erected. Not one dime of the proceeds from the conditional note has been used for that purpose, nor is there a single word of evidence in this record to show that either party ever agreed or intended that any proceeds from this note should be applied to such structure. The general contract clearly shows that the proceeds from the $8000 unconditional note were intended by the borrower to be used for the erection of a four-unit apartment, either in the front portion of the old Godwin home or in front of the old Godwin home and for living quarters in the rear. Whether it be said that the contract as to the exact location of the structures intended by this portion of the contract is uncertain and ambiguous, or that the parties agreed to depart from the original plan in this connection, it is nevertheless clear beyond dispute that the parties had before them exhibits 8 and 9 and agreed to such exhibits simultaneously with the execution of the contract. These exhibits provide for a new structure in front of the Godwin Home Place. The work begun conforms to these

exhibits, and is in harmony with the contract and the intention of the parties as relates exclusively to the first or unconditional note. These documents, exhibits 8 and 9, having been before the parties and agreed upon simultaneously with and as a part of the contract must be read and construed together with the contract itself. *Read* v. *Gould,* 139 *Ga.* 499 (77 S. E. 642); *Dyal* v. *Foy & Shemwell Inc.,* 159 *Ga.* 848 (126 S. E. 783); *Mathewson* v. *Brigman Motors Co.,* 23 *Ga. App.* 304 (98 S. E. 98).

Were there nothing in the evidence to indicate a contrary intention, the fact that a separate four-unit apartment in front of the Godwin home was assented to by the parties after the execution of the contract might possibly have authorized the jury to draw an inference that they intended for this to take the place of the apartment in the rear as provided by the contract. But something very definitely does appear, showing conclusively a contrary intention, to wit: the borrower by his letter of September 1, 1941, specified this apartment as the structure he intended to build with the proceeds of the unconditional loan which was then available and none of which had been used. Then, when five days thereafter he presented to the lender the floor plan shown by exhibit 10, which is a floor plan of the structure he had described in such letter, there is no room for any reasonable inference except that both parties, by agreeing to the floor plan shown by exhibit 10, intended that it conform to the letter of September 1, 1941, and be erected with the first loan, and that neither thereby intended to alter the terms of the conditional loan.

The majority opinion quotes the Code, § 38-507. I think that section has no application here. The applicable statute is § 20-116, but under this latter section a departure that will work a novation of the original contract must be mutually intended and assented to. *Bearden Mercantile Co.* v. *Madison Oil Co.,* 128 *Ga.* 695 (58 S. E. 200); *Southern Feed Stores* v. *Sanders,* 193 *Ga.* 884 (20 S. E. 2d, 413); *Jones* v. *Lawman,* 56 *Ga. App.* 764 (194 S. E. 416); Pittsburgh Plate Glass Co. *v.* Jarrett, 42 Fed. Supp. 723. Can this court, when the evidence shows no mutual departure, hold that the jury was authorized to find that the lender in this case agreed with the borrower and consented that the proceeds from the conditional loan of $8000 should be diverted from the original purpose of erecting an apartment on lots 54 and 56, and be ap-

plied to an apartment in front of the Godwin Home Place, in the face of the precaution that the lender took to avoid just such a predicament by requiring the borrower to state in writing over his own signature that the structure in front of the Godwin Home Place, together with the alterations of the old building, would be completed with the sum of $8000, which is exactly the amount of the unconditional loan? If this precaution on the part of the lender will not protect him against the claims asserted here, then I submit that it would be difficult for one to reduce his agreement to writing in any form and thereby avoid unfounded claims in contradiction to that writing. We have here the borrower stating over his own signature that the structure which he has started was to be completed with an expenditure of $8000. We have documents to which both parties agreed providing for the same thing. We have the lender testifying under oath to the same thing, and the only thing upon which this overwhelming evidence is set aside is the testimony of Henderson's general agent that a departure and alteration of the writing had been agreed upon subsequently to the contract, and then testifying that the only departure or alteration agreed upon subsequently to the contract was the petitioner's exhibit 10, which is simply a floor plan for the structure shown by the petitioner's exhibits 8 and 9 and which was contemplated by the contract and agreed upon by the parties at the time of its execution. To allow a party to stand in the face of this overwhelming evidence and assert a claim upon such utterly baseless ground, should not have the sanction of law.

Undoubtedly the ugly picture of the incomplete building, leaving as it does the entire structure exposed to the weather, which will cause rapid deterioration, and also rendering all of it untenantable, thus depriving the owner of any income therefrom, makes a strong appeal to the human heart and causes deep sympathy to go out to the unfortunate owner. In the absence of legal obstacles, the natural and human reaction would be to help such owner and protect him against such loss. If another inflicted it, then such other one should be required to compensate him in damages. Then, with the petition and the testimony on behalf of the petitioner stating a general conclusion of the witness, saying to the jury that the lender caused the damage by a breach of the contract to lend money with which to complete the work, the

jury evidently made its verdict upon this alone, without taking note of the fact that: (a) there was no evidence to show a mutual departure from the contract; (b) if there was any departure, it related solely to that portion dealing with the loan actually made; and (3) there was no semblance of a breach of the contract by the lender shown by any evidence whatsoever. The jury might easily have overlooked these insurmountable legal obstacles to any recovery, but this court can not overlook them. Indeed one of the purposes for allowing a review by this court is to insure that every case terminate in a judgment arrived at by observing all applicable rules of law, and thus subject evidence to careful scrutiny for its legal import. We know that, although the petitioner has suffered great injury, he can not lawfully require the lender to compensate him for that injury unless the lender caused the injury by a breach of the contract in the manner alleged in the petition. We know that, when given its full legal meaning, the petitioner's evidence fails to show such a breach, and hence it becomes our duty to reverse the judgment. The undisputed evidence shows that the petitioner's entire injury resulted from his faulty judgment in thinking that he could complete the building started with the $8000 he obtained with the first note, just as he said he could do in the letter of September 1, 1941, addressed to the lender. His signed statement that it would be done with $8000 is irreconcilable with the jury's finding that the parties had agreed to do it with $16,000. By that letter both parties state what their intentions were, what they mutually agreed to as to the total amount of money they intended to use in completing the structure the petitioner started. It does not come within the lawful power of the jury to disregard what both parties thus say was their intention, and in the absence of a scintilla of other evidence find their intention to have been to expend double the amount the parties state, and spend $16,000 instead of $8000. Such a finding by the jury being essential to authorize the verdict rendered, and the evidence demanding a different finding, the verdict is contrary to both the law and the evidence, and the court erred in overruling the general grounds of the motion for new trial.

I have not discussed the rulings upon the exceptions to the charge of the court, but in view of the clear error, as I see it, in

the ruling on the general grounds, the case should be reversed, and I am unable to concur in any of the rulings made in the majority opinion.