### A11A1379. FLYNT v. LIFE OF THE SOUTH INSURANCE COMPANY.
(718 SE2d 343)

BARNES, Presiding Judge.

In this dispute over credit life insurance, the widow of the insured, individually and as executrix of his estate, appeals the denial of her motion for partial summary judgment against the insurer and the grant of the insurer's motion for summary judgment on all of her claims. In its summary judgment order, the trial court concluded that the uncontroverted evidence showed that the insured decedent had made material misrepresentations regarding his health in his applications for credit life insurance coverage, thereby enti-

tling the insurer to rescind coverage and deny the widow's claims to the insurance proceeds. The trial court further concluded that an incontestability clause contained in the certificates of insurance, which limited the time period within which the insurer could rescind coverage based upon misrepresentations made by an insured, did not apply under the circumstances of this case. Accordingly, the trial court ruled that the widow was not entitled to recover the insurance proceeds, prejudgment interest, or bad faith penalties and attorney fees under OCGA § 33-4-6.

Based upon the intent of the parties reflected in the language of the applicable certificates of insurance and group life insurance policy, we conclude that the incontestability clause applied such that the insurer could not deny or rescind coverage. Consequently, the trial court should have granted summary judgment in favor of the widow on her claims to the insurance proceeds and prejudgment interest. However, because the insurer's reasons for refusing to pay the insurance proceeds to the widow were erroneous, but not frivolous or unreasonable, the trial court did not err in granting summary judgment in favor of the insurer on the widow's claim for bad faith penalties and attorney fees.

> Summary judgment is appropriate if the pleadings and evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. On appeal from the grant or denial of summary judgment, we conduct a de novo review, with all reasonable inferences construed in the light most favorable to the nonmoving party.

(Citation omitted.) *Richardson v. Phillips*, 302 Ga. App. 305 (690 SE2d 918) (2010). See OCGA § 9-11-56 (c). With these principles in mind, we turn to the record in the instant case.

*The Three Loans to the Decedent.* The relevant facts are undisputed. Linda Smith Flynt is the widow of Gifford H. Flynt, Jr., and the executrix of his estate. The decedent was a crop duster who died in the course of that work when his plane crashed on July 12, 2008. At the time of his death, the decedent had three outstanding loans with Pelham Banking Company (the "Bank"), each of which was evidenced by a promissory note. Each of the three loans had been in effect for a number of years and each had been renewed periodically by the decedent. The three loans are discussed in detail below.

First, in August 2003, the decedent borrowed approximately $23,000 from the Bank under a promissory note which matured in August 2004. The promissory note subsequently was renewed in August 2004, August 2005, August 2006, November 2006, and

November 2007.

Second, in December 2003, the decedent borrowed approximately $20,000 from the Bank under a promissory note which matured in December 2004. The promissory note thereafter was renewed in December 2004, November 2005, November 2006, and November 2007.

Third, in December 2004, the decedent borrowed approximately $109,000 from the Bank under a promissory note which matured in December 2005. The promissory note was renewed in December 2005, December 2006, and December 2007.

*The Group Life Insurance Policies.* The Bank has made credit life insurance available to its borrowers through a group policy issued by Life of the South Insurance Company for many years.[1] In May 1998, Life of the South issued a group policy to the Bank that remained in effect until 2006. Under the policy, the Bank would make credit life insurance available to its borrowers who wished to purchase coverage. The Bank would collect premiums at the rates specified by Life of the South and would provide the borrower purchasing insurance with a certificate of coverage under the group policy, using a certificate form provided by Life of the South. The Bank remitted the premiums to Life of the South and earned a commission on each transaction.

In 2006, Life of the South revised its group policy and its certificate forms, and a revised group policy was issued to the Bank effective May 2006. As part of the revisions, the application for the certificate of insurance, which had to be completed by a borrower when applying for coverage, included a "Statement of Debtor's Physical Condition" that read as follows:

> In applying for life coverage, I (we) hereby represent that I (we) have not been diagnosed, treated (including medication), consulted or received advice from a physician within the past twenty-four (24) months for any of the following: a heart disease, condition or disorder; cancer (excluding basal cell carcinoma); *diabetes*; drug or alcohol abuse; Acquired Immune Deficiency Syndrome (AIDS) or Aids Related Complex (ARC); or tested positive for HIV virus.

(Emphasis supplied.) The version of the application in effect prior to

---

[1] "Credit life insurance" refers to "insurance on the life of a debtor pursuant to or in connection with a specific loan or other credit transaction." OCGA § 33-31-1 (2). In general terms, a credit life insurance policy provides that the insurer will pay off the amount due on the debt if the debtor dies. See *Resource Life Ins. Co. v. Buckner*, 304 Ga. App. 719, n. 1 (698 SE2d 19) (2010). Credit life insurance policies are governed by Chapter 31 of Title 33 of the Georgia Code.

May 2006 did not include diabetes as one of the diseases that had to be disclosed by the applicant. Other than the revisions to the group policy and the certificate forms, the Bank's relationship with Life of the South and the manner in which it provided insurance coverage to its borrowers did not change.

*The Decedent's Credit Insurance Coverage.* The decedent applied for and obtained credit life insurance from Life of the South when he acquired each of the three loans in 2003 and 2004, respectively. He also applied for and obtained credit life insurance from Life of the South each time he renewed the promissory note on each of the loans. At the time of each renewal, the Bank would issue the decedent a certificate reflecting coverage under the Life of the South group policy then in effect. In applying for coverage in 2006 and 2007, the decedent signed an application for each certificate of insurance that for the first time included diabetes as one of the diseases listed in the Statement of Debtor's Physical Condition. Although the decedent signed the statement representing that he had not been diagnosed with that disease, a physician had diagnosed him with Type II diabetes in the late 1990s.

*The Dispute over Payment of Insurance Proceeds.* The decedent died on July 12, 2008. Outstanding balances remained on his three loans from the Bank. The three certificates of credit life insurance issued to the decedent in 2007, evidencing coverage under the Bank's 2006 group policy, were in effect at the time of his death.

Following the death of the decedent, his widow submitted claims under the three insurance certificates that were in effect at the time. In response, Life of the South conducted an investigation and decided to rescind coverage, asserting that the decedent misrepresented the state of his health in his applications for insurance beginning in 2006, and that, if the applications had been accurate, the certificates of insurance would not have been issued.

The widow responded through counsel that Life of the South was precluded from denying or rescinding coverage in light of an incontestability clause[2] contained in the certificates of insurance that provided: "We cannot contest the insurance evidenced by the Certificate after it has been in force two (2) years during your . . . lifetime." The 2006 group policy likewise contained an incontestability clause that provided: "We cannot contest the insurance evidenced by the Certificate after it has been in force two (2) years during the

---

[2] An incontestability clause contained in an insurance policy "is an agreement by which the insurance company limits the period of time in which it will interpose objections to the validity of the policy or set up any defense except such as may be reserved to it in the contract." Judy E. Zelin, 16 Ga. Jurisprudence: Insurance § 11:1 (updated June 2011). See *Blue Cross &c. v. Sheehan*, 215 Ga. App. 228, 229 (1) (450 SE2d 228) (1994).

lifetime of the Insured Debtor[.]'' Life of the South disputed whether the incontestability clause had taken effect and refused to pay out the insurance proceeds.

*The Litigation.* The widow, individually and as executrix of the decedent's estate, then commenced this action against Life of the South to recover the proceeds of the three insurance certificates. She sought the face amount of each certificate, prejudgment interest, and bad faith penalties and attorney fees under OCGA § 33-4-6. Life of the South answered, admitting that it had issued the insurance coverage to the decedent but denying liability on the ground that the application for each certificate of insurance contained materially false representations entitling it to rescind coverage. The parties cross-moved for summary judgment, with the widow seeking partial summary judgment on the issue of her entitlement to the insurance proceeds and prejudgment interest, and Life of the South seeking summary judgment on all of the widow's claims.

The trial court denied summary judgment to the widow but granted it to Life of the South on all of her claims. The trial court concluded that each certificate of credit life insurance was a separate and distinct insurance policy such that the two-year incontestability clause began to run anew upon the issuance of each new certificate. Because two years had not passed from the time that the decedent was issued his last certificates in 2007 to the time of his death, the trial court ruled that the incontestability clause had not become operative and could not be invoked by his widow. The trial court further concluded that there was no continuation of insurance coverage because the 1998 group policy and the 2006 group policy were not substantially similar. Additionally, the trial court found that the terms of the applications for insurance were unambiguous; that by signing the applications in 2006 and 2007 the decedent misrepresented the status of his health with respect to Type II diabetes; and that these misrepresentations were material. Lastly, the trial court concluded that Life of the South did not act in bad faith in denying the widow's claims, precluding an award of bad faith penalties and attorney fees, and that the widow could not introduce evidence of Life of the South's conduct in two prior insurance cases to demonstrate bad faith.

1. The widow argues that the trial court erred in concluding that she was not entitled to recover the proceeds of the three insurance certificates issued to the decedent. According to the widow, the trial court should have enforced the two-year incontestability clause contained in the certificates of insurance and the 2006 group policy based upon well-recognized principles of insurance contract con-

struction.[3] We agree.

Under Georgia law, insurance is a matter of contract, see *Richards v. Hanover Ins. Co.*, 250 Ga. 613, 614 (1) (299 SE2d 561) (1983), and the cardinal rule of contract construction is to determine the intent of the parties. See *Municipal Elec. Auth. of Ga. v. Gold-Arrow Farms*, 276 Ga. App. 862, 866 (1) (625 SE2d 57) (2005). "To determine the intent of the parties, all the contract terms must be considered together in arriving at the construction of any part, and a construction upholding the contract in whole and every part is preferred." (Citations omitted.) Id. Thus, an insurance policy, like other contracts, should not be construed in a manner that would render any of its provisions meaningless or mere surplusage. See *York Ins. Co. v. Williams Seafood of Albany*, 273 Ga. 710, 712 (1) (544 SE2d 156) (2001); *VATACS Group v. Homeside Lending*, 276 Ga. App. 386, 389-390 (1) (623 SE2d 534) (2005). Moreover, ambiguities in an insurance policy are strictly construed against the insurer as the drafter, see *Richards*, 250 Ga. at 615 (1), and a policy should be read as a layman would read it rather than as it would be construed by an insurance expert or attorney. See *Williams Seafood of Albany*, 273 Ga. at 712 (1); *Greer v. IDS Life Ins. Co.*, 149 Ga. App. 61, 63 (1) (b) (253 SE2d 408) (1979). Applying these interpretive rules and construing a written insurance policy are matters of law for resolution by the trial court which are subject to de novo review on appeal. See *Resource Life Ins. Co. v. Buckner*, 304 Ga. App. 719, 726 (1) (698 SE2d 19) (2010).

We now turn to the relevant provisions of the insurance policy in this case that were effective at the time of the decedent's death. A contract of group insurance is composed of the master group policy and the certificate of insurance, the terms of which must be construed together. See *Adana Mtg. Bankers v. Bankers Ins. Svc. Corp.*, 186 Ga. App. 76 (366 SE2d 408) (1988). As previously noted, the three certificates of insurance in effect at the time of the decedent's death provided: "We cannot contest *the insurance evidenced by the Certificate* after it has been in force two (2) years during your . . . lifetime." (Emphasis supplied.) The 2006 group policy contained an incontestability clause that similarly provided: "We cannot contest *the insurance evidenced by the Certificate* after it has been in force two (2) years during the lifetime of the Insured Debtor[.]" (Emphasis supplied.) The widow argues that this language shows that the parties intended for the incontestability clause

---

[3] In a separate enumeration of error, the widow argues that the trial court erred in failing to enforce the incontestability clause in light of *Founders Life Assurance Co. of Fla. v. Poe*, 242 Ga. 748 (251 SE2d 247) (1978). We need not address this argument in light of the decision in Division 1.

to become operative two years after insurance was first obtained on a loan. In other words, the two-year incontestability period began to run when coverage was originally issued to the decedent for his three loans (i.e., in 2003 and 2004), not each time the master group policy was revised or a new insurance certificate was issued.

The widow's interpretation of the incontestability clause makes interpretive sense for several reasons. First, the incontestability clause, when construed together with another provision of the 2006 group policy, was not intended by the parties to begin running anew when the group policy was revised in 2006. Specifically, the 2006 group policy contains a provision separate from the incontestability clause, entitled "Renewal or Refinanced Indebtedness," which states in relevant part:

> If the indebtedness insured under this Group Policy [i.e., the 2006 group policy] is discharged prior to the scheduled maturity date due to renewal or refinancing, the effective date for the renewed or refinanced indebtedness will be the first date on which the Insured Debtor became insured under this Group Policy. . . . *Nothing in this provision shall preclude the Incontestability Clause.*

(Emphasis supplied.) In essence, this provision states that if a borrower's loan is renewed or refinanced, the effective date for insurance purposes is the first date upon which the borrower became insured under the 2006 group policy. But the provision contains a carve-out for the incontestability clause, indicating that when a loan is renewed or refinanced, the effective date for the running of the incontestability clause is not limited to when the borrower first became insured under the 2006 group policy. Moreover, by referring to "this Group Policy" in the "Renewal or Refinanced Indebtedness" provision, Life of the South demonstrated that if it wanted to restrict the effective date of a policy provision to the date that the 2006 group policy was issued, it knew how to do so; its failure to do so with regard to the incontestability clause thus should be treated a matter of considered choice. See *Ins. Co. of Pa. v. APAC-Southeast*, 297 Ga. App. 553, 558-559 (677 SE2d 734) (2009).

Second, principles of contract construction indicate that the incontestability clause should not be construed as running anew each time a new certificate of insurance was issued upon the renewal or refinancing of a loan. If the incontestability clause were interpreted to mean that the two-year period would begin to run upon the issuance of each new certificate of insurance, it would render the clause ineffectual because each of the certificates issued to the decedent had no more than a one-year term of duration. As such, if

the two-year period ran anew upon the issuance of each certificate, the incontestability clause could never become operative. Courts must avoid "giving the contract a construction which entirely neutralizes one provision if it is susceptible of another which gives effect to all of its provisions." *VATACS Group*, 276 Ga. App. at 389-390 (1). Thus, to avoid neutralizing the incontestability clause, the two-year incontestability period should be interpreted as beginning to run from when insurance coverage on a loan was first obtained rather than from when a particular certificate was issued.

Third, to the extent that the incontestability clause is ambiguous concerning when the two-year incontestability period should begin to run, "ambiguities in the contract are strictly construed against the insurer as the drafter of the document," as previously noted. (Citation and punctuation omitted.) *Guaranty Nat. Ins. Co. v. Brock*, 222 Ga. App. 294, 296 (2) (474 SE2d 46) (1996). Hence, even if ambiguous, the incontestability clause must be strictly construed against Life of the South and in favor of coverage. See id.

For these three primary reasons, we conclude that the interpretation of the incontestability clause put forward by the widow is consistent with the applicable rules of insurance contract construction. Accordingly, the two-year incontestability period began to run from the time that the decedent first obtained credit life insurance from Life of the South on his three loans, which was in 2003 and 2004, respectively. It follows that the incontestability provision had become operative by the time of his death in 2008 and precluded Life of the South from denying or rescinding insurance coverage based upon his representations in 2006 and 2007 concerning his health. The trial court erred in concluding otherwise and should have ruled that the widow was entitled to the insurance proceeds as a matter of law.

2. The widow also argues that the trial court erred in concluding that she was not entitled to recover prejudgment interest. Again, we agree.

> OCGA § 7-4-15 provides: "All liquidated demands, where by agreement or otherwise the sum to be paid is fixed or certain, bear interest from the time the party shall become liable and bound to pay them; if payable on demand, they shall bear interest from the time of the demand." Such prejudgment interest is mandatory rather than discretionary and is awarded by a judge as a matter of law. Liquidated insurance claims are subject to prejudgment interest.

(Punctuation and footnotes omitted.) *Florida Intl. Indem. Co. v.*

*Osgood*, 233 Ga. App. 111, 116 (4) (503 SE2d 371) (1998).[4]

Here, the only issue contested by Life of the South was the existence of coverage, not the amount of the widow's claim; thus, the widow's claim to the insurance proceeds was liquidated. See *Enfinger v. Intl. Indem. Co.*, 257 Ga. 385 (359 SE2d 884) (1987) (per curiam). It follows that because the widow was entitled to collect the insurance proceeds as explained in Division 1, she likewise was entitled to an award of prejudgment interest as a matter of law. See OCGA § 7-4-15; *Osgood*, 233 Ga. App. at 116 (4).

3. The widow further argues that the trial court erred in concluding that she was not entitled to recover bad faith penalties and attorney fees under OCGA § 33-4-6. We disagree.

Under OCGA § 33-4-6,

> additional liability is not automatically imposed on an insurance company every time it refuses to pay the underlying claim prior to trial and the insured successfully litigates the dispute. Instead, the insurer is liable for the penalty and attorney[ ] fees only if it acts in "bad faith" in refusing to pay the claim. The burden of proof is on the insured to establish bad faith.

(Citations omitted.) *Winningham v. Centennial Ins. Co.*, 708 F2d 658, 659 (11th Cir. 1983) (per curiam) (applying Georgia law). See *Osgood*, 233 Ga. App. at 115-116 (3). " '[B]ad faith' means a frivolous and unfounded refusal to pay the claim." *Businessmen's Assurance Co. of America v. Tilley*, 109 Ga. App. 529, 535 (3) (136 SE2d 514) (1964). An insurer's refusal to pay is not frivolous or unfounded if is predicated upon "a reasonable question of law or a reasonable issue of fact," even if the insurer's position ultimately is rejected by a court or jury. *Colonial Life &c. Ins. Co. v. McClain*, 243 Ga. 263, 265 (1) (253 SE2d 745) (1979).

While Life of the South's interpretation of the 2006 group policy and the certificates of insurance was erroneous, we do not believe that the interpretive issues involved in this case were so clear that the insurer's interpretation should be considered frivolous or unreasonable.[5] The trial court thus did not err in concluding that, as a matter of law, the widow was not entitled to bad faith penalties and

---

[4] OCGA § 33-25-10 governs the entitlement to prejudgment interest on life insurance proceeds, see *Southwestern Life Ins. Co. v. Middle Ga. Neurological Specialists*, 262 Ga. 273, 276 (2) (416 SE2d 496) (1992), but the statute expressly states that it does not apply "to policies of credit life insurance." OCGA § 33-25-10 (c) (3).

[5] The widow also contends that the trial court erred in ruling that she could not introduce evidence of Life of the South's conduct toward insureds in two prior cases in which it refused to honor incontestability clauses to demonstrate bad faith. We conclude, however, that the trial

attorney fees under OCGA § 33-4-6.

4. Additionally, the widow argues that the trial court erred in concluding that the reference to diabetes in the "Statement of Debtor's Physical Condition" contained in the 2006 and 2007 insurance applications signed by the decedent was not ambiguous and in ruling as a matter of law that the decedent's misrepresentations regarding his health were material. We need not address these alleged errors, given our conclusion in Division 1 that the incontestability clause had become operative and precluded Life of the South from denying or rescinding coverage in this case.

In summary, for the reasons discussed above, we reverse the trial court's denial of the widow's motion for partial summary judgment; reverse the trial court's grant of summary judgment in favor of Life of the South on the widow's claims for the insurance proceeds and prejudgment interest; and affirm the trial court's grant of summary judgment in favor of Life of the South on the widow's claim for bad faith penalties and attorney fees under OCGA § 33-4-6. The case is remanded with the instruction that judgment be entered in favor of the widow on her claims for the insurance proceeds and prejudgment interest, and in favor of Life of the South on the widow's claim for bad faith penalties and attorney fees.

*Judgment affirmed in part and reversed in part. Adams, J., concurs. Blackwell, J., concurs in Divisions 2, 3 and 4 and in the judgment.*

DECIDED NOVEMBER 7, 2011 — 

*Powell & Erwin, William A. Erwin*, for appellant.
*Heyman & Sizemore, Jacqueline Marcucci*, for appellee.

---

court did not abuse its discretion in disallowing evidence of the two prior cases. The trial court was entitled to find that the prior cases were materially dissimilar from the present one, given that neither of those cases involved coverage under the 2006 group policy and the revisions to the certificate of insurance forms made that year. See *Metropolitan Property &c. Ins. Co. v. Shepherd*, 166 Ga. App. 300, 301 (1) (304 SE2d 74) (1983) (trial court did not abuse its discretion in disallowing evidence of prior fire incidents, given that, unlike in the case-at-hand, there was no evidence that the incidents were of incendiary origin or were attributable to criminal conduct).