**C & C FAMILY TRUST 04/04/05, by and through its Trustees Cynthia COX–OTT and Patricia Ann Cox, Plaintiff,**

v.

**AXA EQUITABLE LIFE INSURANCE COMPANY, AXA Advisors LLC and Armen Hovakimian, Defendants.**

Civil Action No. 3:14–CV–62–TCB.

United States District Court,
N.D. Georgia,
Newnan Division.

Signed Aug. 28, 2014.

James J. Leonard, Kara Cleary, Barnes & Thornburg LLP, Atlanta, GA, for Plaintiff.

David G. Russell, Peter Frank Busscher, Parker, Hudson, Rainer & Dobbs, LLP, Atlanta, GA, for Defendants.

### ORDER

TIMOTHY C. BATTEN, SR., District Judge.

## I. Background [1]

In 1988, Cynthia Cox–Ott married Claude Ott. When they divorced in 2005, part of Cynthia's settlement included the establishment of a life insurance trust: Plaintiff C & C Family Trust 04/04/05.[2] The funding mechanism for the trust was a policy insuring Claude's life and naming the trust as the beneficiary. This action centers on that policy.

In August 2005, the trust took out a "flexible premium universal life insurance policy" from Defendant AXA Equitable Life Insurance Company. Before doing so, Cynthia had several discussions with Defendant Armen Hovakimian, an employee or agent of Defendants AXA Advisors LLC or AXA Equitable (or both),[3] who showed her illustrations and projections for policies issued by AXA Equitable. She selected a policy that would be paid up when Claude (then sixty-seven) turned eighty-three; provided a net death benefit of $4,000,000; and had an annual premium of $88,000. The policy was delivered to the trust on February 16, 2006.

During 2005 and 2006, AXA represented that the policy's paid-up date, net death benefit and annual premium were "guaranteed." These representations were made orally by Hovakimian and in written policy illustrations, which AXA Equitable prepared. Specifically, on February 24, 2006, eight days after the policy's delivery, Hovakimian discussed with Cynthia an "Original Illustration" showing "Guaranteed Values" for the "Annualized Premium Outlay" ($88,000) and "Net Death Benefit" ($4,000,000). Based on this representation, the trust decided to keep the policy in force.

In her capacity as trustee, Cynthia made an initial premium outlay of $165,800 and

---

1. At the motion-to-dismiss stage, the factual allegations in the complaint are accepted as true, and all inferences from these allegations are construed in the light most favorable to the plaintiff. *Belanger v. Salvation Army*, 556 F.3d 1153, 1155 (11th Cir.2009).

2. Cynthia and her mother Patricia are the trustees.

3. In this Order, unless otherwise indicated AXA Advisors and AXA Equitable are collectively referred to as AXA.

paid the annualized premium of $88,000 each year since the policy issued.

In July 2012, the trust received its annual policy report from AXA Equitable. Because this report revealed conflicting notices, projections and illustrations, the trust retained counsel to get clear answers from AXA Equitable. Specifically, the trust asked AXA Equitable to confirm that the annual premium was $88,000 and inquired when the policy would be paid up.

AXA Equitable did not respond, so in April 2013 the trust filed a formal complaint with the Georgia Insurance Commissioner. Two months later, AXA Equitable informed the trust that premium increases would be required to keep the policy in force.

Given this explanation, the trust alleges that in 2005 and 2006 AXA misrepresented the policy's "guaranteed values and annualized premium outlays." In this action, the trust brings claims for common-law fraud (count one) and negligent misrepresentation (count two) against AXA Advisors and AXA Equitable. The trust also seeks equitable reformation of the policy (count three) against AXA Equitable.

AXA now moves to dismiss the trust's complaint for failure to state a claim [3]. That motion will be granted.

## II. Legal Standard

A claim will be dismissed under Federal Rule of Civil Procedure 12(b)(6) if the plaintiff does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Chandler v. Sec'y of Fla. Dep't of Transp.*, 695 F.3d 1194, 1199 (11th Cir.2012). The Supreme Court has explained this standard as follows:

A claim has facial plausibility when the plaintiff pleads factual content that al-lows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal citation omitted); *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir.2012). Thus, a claim will survive a motion to dismiss only if the factual allegations in the complaint are "enough to raise a right to relief above the speculative level," and "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. And while all well-pleaded facts must be accepted as true and construed in the light most favorable to the plaintiff, *Powell v. Thomas*, 643 F.3d 1300, 1302 (11th Cir.2011), the court need not accept as true plaintiff's legal conclusions, including those couched as factual allegations, *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. Thus, evaluation of a motion to dismiss requires two steps: (1) eliminate any allegations in the complaint that are merely legal conclusions, and (2) where there are well-pleaded factual allegations, "assume their veracity and ... determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679, 129 S.Ct. 1937.

## III. Discussion

Fraud and negligent misrepresentation are similar causes of action. Indeed, " 'the only real distinction between negligent misrepresentation and fraud is the absence of the element of knowledge of the falsity of the information disclosed.' " *Holmes v. Grubman*, 286 Ga. 636, 691 S.E.2d 196, 200 (2010) (quoting *Mindis Acquisition Corp. v. BDO Seidman, LLP*, 253 Ga.App. 360, 559 S.E.2d 111, 118 (2002), *rev'd on other grounds*, 276 Ga. 311,

578 S.E.2d 400 (2003)) (internal quotation marks omitted). And because " '(t)he same principles apply to both fraud and negligent misrepresentation cases,' " *id.* (alteration in original) (quoting *Mindis Acquisition,* 559 S.E.2d at 118) (internal quotation marks omitted), the Court's analysis focuses on AXA's alleged fraud.

AXA offers four reasons to dismiss the trust's fraud claim: it

(1) is not pleaded with particularity;

(2) is time-barred;

(3) fails on the merits; and

(4) is barred by the policy's merger clause.

And because the trust's reformation claim is derivative of its fraud and negligent-misrepresentation claims, AXA argues that it, too, fails as a matter of law.

## A. Pleading Georgia Common–Law Fraud in Federal Court

■ To state a claim for fraud under Georgia law, the plaintiff must allege facts showing that (1) the defendant knowingly made a false statement; (2) the defendant intended for the plaintiff to act or refrain from acting in reliance on that statement; (3) the plaintiff justifiably relied on the defendant's false statement; and .(4) the plaintiff's reliance resulted in damage. *Wylie v. Denton,* 323 Ga.App. 161, 746 S.E.2d 689, 695 (2013).[4]

■ Federal Rule of Civil Procedure 9(b) provides that a party alleging fraud "must state with particularity the circumstances constituting fraud" but may allege scienter generally.[5] This heightened-pleading standard amplifies rather than abrogates the notice-pleading requirements of Rule 8(a). *Edwards v. Wis. Pharmacal Co.,* 987 F.Supp.2d 1340, 1347 (N.D.Ga.2013).[6]

---

4. Similarly, to state a claim for negligent misrepresentation, the plaintiff must allege facts showing that (1) the defendant negligently provided false information to foreseeable persons, known or unknown, including the plaintiff; (2) the plaintiff reasonably relied on this false information; and (3) the plaintiff's reliance proximately caused an economic injury. *Home Depot U.S.A. v. Wabash Nat'l Corp.,* 314 Ga.App. 360, 724 S.E.2d 53, 60 (2012).

5. AXA contends that Rule 9(b) applies to the trust's negligent-misrepresentation claim. The Eleventh Circuit has not held that this is true for claims arising under Georgia law. *See Purchasing Power, LLC v. Bluestem Brands, Inc.,* No. 1:12–cv–258–WSD, 2012 WL 3065419, at *7 n. 4 (N.D.Ga. July 27, 2012) (explaining that the Eleventh Circuit "has not passed on" whether Rule 9(b) applies to negligent-misrepresentation claims and acknowledging that "the district courts within our Circuit have reached different conclusions"). This Court, however, has generally not applied Rule 9(b) to negligent-misrepresentation claims arising under Georgia law. *See, e.g., Coast Buick GMC Cadillac, Inc. v. Mahindra & Mahindra, Ltd.,* No. 1:12–cv–1935–TWT, 2013 WL 870060, at *5 (N.D.Ga. Mar. 7, 2013) ("A claim for negligent misrep-

resentation does not carry the heightened pleading standard applicable to a claim for fraud."); *Atwater v. Nat'l Football League Players Ass'n,* No. 1:06–cv–1510–JEC, 2007 WL 1020848, at *14 (N.D.Ga. Mar. 29, 2007) (refusing to apply Rule 9(b) to negligent-misrepresentation claims arising under Georgia law because "the 11th Circuit has not applied Rule 9(b) outside of the fraud context").

Here, however, the trust does not challenge AXA's contention, so the Court assumes that Rule 9(b) applies to its negligent-misrepresentation claim. *Accord Purchasing Power,* 2012 WL 3065419, at *7 n. 4.

6. The Fifth Circuit elaborates further on this point:

In cases of fraud, Rule 9(b) has long played [a] screening function, standing as a gatekeeper to discovery, a tool to weed out meritless fraud claims sooner than later. We apply Rule 9(b) to fraud complaints with "bite" and "without apology," but also aware that Rule 9(b) supplements but does not supplant Rule 8(a)'s notice pleading. Rule 9(b) does not "reflect a subscription to fact pleading" and requires only "simple, concise, and direct" allegations of the "cir-

To plead fraud with particularity, the plaintiff must allege

(1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud.

*FindWhat Investor Grp. v. FindWhat.com,* 658 F.3d 1282, 1296 (11th Cir.2011), *cert. denied,* —— U.S. ——, 133 S.Ct. 109, 184 L.Ed.2d 23 (2012). In short, the plaintiff must plead facts that when taken as true establish the who, what, when, where, how and why of the fraud. *See Garfield v. NDC Health Corp.,* 466 F.3d 1255, 1262 (11th Cir.2006). Requiring fraud to be pleaded with particularity serves an important purpose: it "alert[s] defendants to the 'precise misconduct with which they are charged' and protect[s] defendants 'against spurious charges of immoral and fraudulent behavior.'" *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1202 (11th Cir.2001) (quoting *Durham v. Bus. Mgmt. Assocs.,* 847 F.2d 1505, 1511 (11th Cir.1988)) (internal quotation marks omitted).

Here, AXA contends that the trust has not pleaded fraud with particularity. The trust denies this. In its opposition brief, the trust argues that its complaint alleges that AXA "made misrepresentations to [Cynthia] in 2005–2006 orally and in the Policy Illustrations about the 'guaranteed values' of the annual premium and net death benefit of the Policy that [it] knew were false."[7] This is a fair summary.

In its complaint, the trust

- identifies the *who* (or source) of the alleged fraud: AXA's agent Hovakimian and the policy illustrations provided to Cynthia;

- highlights the *what* of the alleged fraud: AXA's statements that the annual premium would remain $88,000 over the life of the policy, even though AXA knew that this was false;

- generally demarcates the *where* of the alleged fraud: many statements were made in Fayette County, Georgia;

- sets out the *when* of the alleged fraud: in 2005 before Cynthia selected the policy and in February 2006 after the policy was delivered to the trust;

- trumpets the *how* of the alleged fraud: AXA made false statements orally (via Hovakimian) and in writing (via the policy illustrations); and

- elucidates the *why* of the alleged fraud: the 2005 statements were made to entice the trust to purchase the policy, and the February 2006 statements were made to ensure that the trust kept the policy in force (or declined to exercise its rights under the policy's cancellation clause [8]).

cumstances constituting fraud," which after *Twombly* must make relief plausible, not merely conceivable, when taken as true. *United States ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 185–86 (5th Cir.2009) (footnotes omitted).

7. Although the trust alleges that AXA misrepresented the policy's paid-up date, its opposition brief completely ignores this allegation. The Court does the same. And because the net death benefit remains $4,000,000 unless the trust changes it or the policy lapses, the crux of this case concerns AXA's allegedly false statements about the annual premium.

8. Once the policy was delivered, the trust had ten days to review it, and if it had been dissatisfied for any reason, the trust could have cancelled the policy and received its money back. To be precise, the policy provides that

**You** [ (the trust) ] **may examine this policy and if for any reason you are not satisfied with it, you may cancel it by returning this**

Contrary to AXA's contention, the trust has pleaded fraud with particularity. That said, the trust could have more clearly alleged the circumstances surrounding AXA's allegedly false 2005 statements. Indeed, after reading the complaint, the Court could only surmise that they occurred during at least one of Hovakimian's "numerous discussions" with Cynthia in which he provided her with policy illustrations. Yet despite the complaint's vagueness, AXA submits a copy of a 2005 illustration—which Hovakimian discussed with Cynthia before she selected the policy—with its opening brief. This suggests that the trust's allegations were specific enough to notify AXA of the circumstances surrounding its allegedly false statements.[9] Rule 9(b) requires nothing more. *Cf. In re Theragenics Corp. Sec. Lit.*, 105 F.Supp.2d 1342, 1350 (N.D.Ga. 2000) (concluding that Rule 9(b) was satisfied and noting that "Defendants knew precisely which specific documents to include as exhibits to their Motion to Dismiss").

The trust is specific about the circumstances surrounding AXA's allegedly false February 2006 statements. These occurred when Cynthia discussed a policy illustration with Hovakimian. Indeed, the trust attaches one of the illustration's twelve pages—page six—as an exhibit to the complaint. Based on these postdelivery statements, Cynthia allegedly continued to believe that the annual premium

would remain $88,000 and decided to keep the policy in force. The trust's fraud claim thus satisfies Rule 9(b).

\* \* \*

The trust alleges that AXA "made a series of false representations" to Cynthia about the policy's "guaranteed values." But regardless of whether these allegedly false statements were made orally or in writing, the content remained the same: the policy provides a net death benefit of $4,000,000 in exchange for a flat annual premium of $88,000. The only legally significant variable is *when* these allegedly false statements were made; that is, before or after the policy was issued and delivered to the trust. For this reason, the Court's analysis proceeds as though the trust alleged only two false statements: one predelivery (in connection with the 2005 illustration) and one postdelivery (in connection with the 2006 illustration).

### B. The Merits of the Trust's Fraud Claim

Although the trust has pleaded fraud with particularity, this does not mean that it has stated a claim upon which relief can be granted. According to AXA, this claim fails on the merits for three reasons. First, AXA's allegedly false statements were about future events—the annual premium over the life of the policy—and such statements are not actionable under Georgia law. Second, the policy's merger

---

**policy with a written request for cancellation to our Administrative Office by the 10th day after you receive it. If you do this, we will refund the premiums that were paid minus any outstanding loan and accrued loan interest.**

The February 2006 statements were made eight days after the policy was delivered to the trust.

9. AXA also submits a copy of the policy as an exhibit to its opening brief. Both the 2005 illustration and the policy are referenced in

the complaint; both are essential to the trust's claims; and neither document's authenticity has been disputed. The Court will thus consider them in ruling on AXA's motion to dismiss. *See Chesnut v. Ethan Allen Retail, Inc.*, 971 F.Supp.2d 1223, 1228 (N.D.Ga. 2013) (citing *Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir.2010); *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n. 2 (11th Cir.1999)).

clause bars the trust from asserting a fraud claim based on oral statements. Third, even if AXA's allegedly false statements were actionable, the trust cannot prove justifiable reliance because the policy documents unambiguously declare that the annual premium may not be sufficient to keep the policy in force.

### 1. False Statements

 In Georgia, a fraud claim cannot be based on "mere broken promises, unfulfilled predictions or erroneous conjecture as to future events." *Greenwald v. Odom*, 314 Ga.App. 46, 723 S.E.2d 305, 313 (2012) (quoting *Infrasource v. Hahn Yalena Corp.*, 272 Ga.App. 703, 613 S.E.2d 144, 148 (2005)). Nor can it be based on representations about expectations or hopes for the future. *Id.* Instead, fraud must generally be based on a false representation of an existing fact or past event. *Id.* But this general rule is subject to a well-recognized exception: a cause of action for fraud may lie where, at the time of the misrepresentation, the promisor either knows that the future event will not occur or has no intention of performing. *Gibson v. Tech. Servs., Inc. v. JPay, Inc.*, 327 Ga.App. 82, 755 S.E.2d 377, 379 (2014). For these reasons, actionable fraud usually cannot "result from a mere failure to perform promises made. Otherwise any breach of a contract would amount to fraud." *Id.* (quoting *J. Kinson Cook of Ga., Inc. v. Heery/Mitchell*, 284 Ga.App. 552, 644 S.E.2d 440, 447 (2007) (internal quotation mark omitted)) (internal quotation marks omitted).

The trust contends that AXA "falsely represented the existing fact that the premium outlays were not guaranteed, but would actually drastically increase at a certain point in the future." Put simply, AXA said that the annual premium would remain $88,000 despite knowing that the annual premium would drastically increase. The trust thus concludes that AXA's allegedly false statements are actionable under Georgia law. Because the trust's fraud claim fails regardless of whether AXA's alleged misrepresentations are actionable, the Court assumes that they are.

### 2. The Merger Doctrine and AXA's Allegedly False Predelivery Statements

 Georgia law generally affords a plaintiff alleging fraud in the inducement two remedial choices: "(1) affirm the contract and sue for damages from the fraud or breach; or (2) promptly rescind the contract and sue in tort for fraud." *Ekeledo v. Amporful*, 281 Ga. 817, 642 S.E.2d 20, 22 (2007) (quoting *Ainsworth v. Perreault*, 254 Ga.App. 470, 563 S.E.2d 135, 137 (2002)). Here, the trust affirmed the policy by seeking its reformation. *Harkins v. Channell*, 274 Ga.App. 478, 618 S.E.2d 129, 132 (2005). And having done so, the trust is bound by the policy's terms and is subject to any contract-based defenses. *Stephen A. Wheat Trust v. Sparks*, 325 Ga.App. 673, 754 S.E.2d 640, 648 (2014).

 The policy contains a merger clause.[10] A merger or integration clause essentially "operates as a disclaimer of all representations not made on the face of the contract." *Id.* "The purpose of a merger clause is to preclude any unilateral modification of a written contract through evidence of preexisting terms which were not incorporated therein." *Thomas v.*

---

**10.** The merger clause provides:
> This policy, any riders or endorsements, and the attached copy of the initial application and all subsequent applications to change this policy, and all additional Policy Information sections added to this policy, make up the entire contract.
> at 11.

*Garrett,* 265 Ga. 395, 456 S.E.2d 573, 574 (1995).

■ Once the parties' agreement has been reduced into a final, written contract, "all prior negotiations, understandings, and agreements on the same subject are merged into the final contract, and are accordingly extinguished." *First Data POS, Inc. v. Willis,* 273 Ga. 792, 546 S.E.2d 781, 784 (2001) (quoting *Health Serv. Ctrs., Inc. v. Boddy,* 257 Ga. 378, 359 S.E.2d 659, 661 (1987) (emphasis omitted) (internal quotation mark omitted)). So if a contract has a merger clause, a contracting party cannot assert that it "relied on representations other than those contained in the contract." *Authentic Architectural Millworks v. SCM Grp. USA,* 262 Ga.App. 826, 586 S.E.2d 726, 729 (2003); *see also First Data POS,* 546 S.E.2d at 785 ("[A] valid merger clause executed by two or more parties in an arm's length transaction precludes any subsequent claim of deceit based upon pre-contractual representations.").

In its opposition brief, the trust posits that the merger clause does not bar its fraud claim. In its view, the policy documents—the 2005 illustration, the policy and page six of the February 2006 illustration—"are at best ambiguous, and at worst intentionally misleading." The trust concludes that "in one document AXA chose to advise its insured that it would guarantee a $4,000,000 policy if $88,000 were paid annually" (the illustrations), "but in another document [AXA] chose to advise its insured that planned premiums 'may' not be sufficient to continue the policy in force" (the policy). Because ambiguity is construed against AXA, the trust concludes that its fraud claim survives AXA's motion to dismiss.

■ The trust is mistaken. By affirming the policy, and thus the merger clause, the trust cannot claim to have relied on AXA's allegedly false predelivery statements when it selected the policy. *Ekeledo,* 642 S.E.2d at 22. This is because AXA's alleged misrepresentations are not contained in the contract. *See Conway v. Romarion,* 252 Ga.App. 528, 557 S.E.2d 54, 58 (2001) ("A merger clause such as the one in the present case prevents a party from claiming reliance upon a representation *not contained in the contract.*" (quoting *Fann v. Mills,* 248 Ga.App. 460, 546 S.E.2d 853, 858 (2001) (emphasis added))). In other words, despite the trust's claims to the contrary, the policy unambiguously declares that the annual premium may not be sufficient to keep the policy in force.

■ Under Georgia law, whether the policy is ambiguous is a question of law. *Wade v. Allstate Fire & Cas. Co.,* 324 Ga.App. 491, 751 S.E.2d 153, 155 (2013). To answer this question, the Court applies the ordinary rules of contract construction. *Boardman Petrol., Inc. v. Federated Mut. Ins. Co.,* 269 Ga. 326, 498 S.E.2d 492, 494 (1998).

■ The Court should ascertain the parties' intent by examining the policy as a whole. *Ryan v. State Farm Mut. Auto. Ins. Co.,* 261 Ga. 869, 413 S.E.2d 705, 707 (1992). The Court should avoid construing the policy "in a manner that would render any of its provisions meaningless or mere surplusage." *Flynt v. Life of S. Ins. Co.,* 312 Ga.App. 430, 718 S.E.2d 343, 347 (2011).

■ The policy's terms should be considered in light of their legal and ordinary meaning, *id.,* and the policy "should be read as a layman would read it," *York Ins. Co. v. Williams Seafood of Albany, Inc.,* 273 Ga. 710, 544 S.E.2d 156, 157 (2001). If the terms are unambiguous—meaning fairly susceptible to only one meaning, *Collier v. State Farm Mut. Auto.*

*Ins. Co.*, 249 Ga.App. 865, 549 S.E.2d 810, 811 (2001)—then "the plain meaning of such terms must be given full effect, regardless of whether they might be beneficial to the insurer or detrimental to the insured," *Tripp v. Allstate Ins. Co.*, 262 Ga.App. 93, 584 S.E.2d 692, 694 (2003) (quoting *Grain Dealers Mut. Ins. Co. v. Pat's Rentals*, 269 Ga. 691, 505 S.E.2d 729, 730 (1998) (internal quotation mark omitted)). But if the policy's terms are ambiguous, the Court must attempt to resolve the ambiguity by applying the relevant canons of contract construction. *Certain Underwriters at Lloyd's of London v. Rucker Constr., Inc.*, 285 Ga.App. 844, 648 S.E.2d 170, 174 (2007).

The trust asserts that the policy is ambiguous because "the circumstances under which the policy premiums 'may' increase or decrease" is unclear. Not only is this assertion false, but it also elides important features of this "flexible premium universal life insurance policy."

The policy functions as a series of credits and debits to a policy account. The policy account is credited the net initial premium and the net periodic premium.[11] The policy account is debited monthly to cover the costs of administration, insurance and riders. In short, the policy remains in effect so long as the policy account has enough funds to cover the monthly deductions.[12]

Usually, a periodic premium is the amount that must be paid to keep the policy in force. *See* BLACK'S LAW DICTIONARY 1371 (10th ed.2014) (defining *premium* as "[t]he amount paid at designated intervals for insurance; esp., the periodic payment required to keep an insurance policy in effect"). Not so here. Under the policy, the *planned periodic premium*—$88,000 annually—is the amount that the trust agreed to pay; it is not the sum of the monthly deductions for the upcoming year. This explains why the policy allows the trust to "within limits … make premium payments at any time and in any amount." Under the policy, therefore, the monthly deductions from the policy account are akin to a traditional premium.

For this reason, the relevant question is whether the policy made plain that the amount that the trust agreed to pay—the planned periodic premium—may be insufficient to cover the monthly deductions. It does.

The policy notifies the trust that five factors affect whether the planned periodic premiums will be sufficient to keep the policy in force. These factors are:

(1) THE AMOUNT, TIMING AND FREQUENCY OF PREMIUM PAYMENTS;

(2) CHANGES IN THE FACE AMOUNT AND THE DEATH BENEFIT OPTIONS;

(3) CHANGES IN THE INTEREST RATES CREDITED TO THIS POLICY;

(4) CHANGES IN THE MONTHLY DEDUCTIONS FROM THE POLICY ACCOUNT FOR THIS POLICY AND ANY BENEFITS PROVIDED BY RIDERS TO THIS POLICY; AND

---

**11.** The "net" premium is the amount that remains after "the premium charge"—"AN AMOUNT NOT TO EXCEED 15% FROM EACH PREMIUM PAYMENT"—has been subtracted.

**12.** The policy also contains a lapse protection rider that allows the policy to remain in effect even if the policy account has insufficient funds to cover the monthly deductions subject to the conditions of the rider.

(5) LOAN AND PARTIAL NET CASH SURRENDER VALUE WITHDRAWAL ACTIVITY.[13]

On that same page, the policy provides that AXA Equitable has "THE RIGHT TO CHANGE THE AMOUNT OF INTEREST CREDITED TO THE POLICY AND THE AMOUNT OF COST OF INSURANCE OR OTHER EXPENSE CHARGES DEDUCTED UNDER THE POLICY WHICH MAY REQUIRE MORE PREMIUM TO BE PAID THAN WAS ILLUSTRATED OR CAUSE THE CASH VALUES TO BE LESS THAN ILLUSTRATED."

The policy is thus clear that the monthly deductions from the policy account, especially the cost of insurance, may not remain fixed. Indeed, the policy expressly warns that AXA Equitable "will determine cost of insurance rates from time to time." This in turn makes clear that the trust's annual premium payment of $88,000 may not be enough to keep the policy in force. There is nothing ambiguous about the circumstances under which the planned periodic premiums may be insufficient to keep the policy from lapsing.

Accordingly, because the policy unambiguously contradicts AXA's allegedly false statements that occurred before the policy was selected—regardless of whether these statements were made orally or in writing—the merger doctrine bars any attempt to ground a fraud claim on them.

\*　　\*　　\*

■ A merger clause, however, does not preclude the parties from subsequently agreeing to modify the contract's terms.

"Parties to a contract can, by subsequent mutual agreement, modify a written contract 'that did not express their actual agreement, just as completely and effectively as they might do with respect to one that did fully and correctly express such intention.'" *Thomas*, 456 S.E.2d at 575 (quoting *Albany Fed. Sav. & Loan Ass'n v. Henderson*, 200 Ga. 79, 36 S.E.2d 330, 345 (1945)); *see also Hernandez v. Carnes*, 290 Ga.App. 730, 659 S.E.2d 925, 928 (2008) (reversing trial court's ruling that the merger clause precluded oral modification because the integrated contract incorporated only the parties' agreement as of the date of execution and noting that the contract lacked a no-oral-modification provision).

■ Here, in addition to the merger clause, the policy provides that any modification must be in writing and signed by a corporate director or officer.[14] This modification clause is valid and enforceable under Georgia law. *Mariner Health Care Mgmt. Co. v. Sovereign Healthcare, LLC*, 306 Ga.App. 873, 703 S.E.2d 687, 691 (2010).

### 3. Justifiable Reliance

■ "[C]ritical to any claim of fraud or negligent misrepresentation is proof that a plaintiff '*actually* and justifiably relied' on the representation forming the basis of his or her claim." *Bithoney v. Fulton–DeKalb Hosp. Auth.*, 313 Ga.App. 335, 721 S.E.2d 577, 584 (2011). This is because a cause of action for fraud will not lie where "the party alleging the fraud had

---

**13.** The trust contends, and the Court accepts, that it has neither made any changes to the face amount or death benefit options nor undertaken any loan or cash-surrender activity. This means that only the first, third and fourth factors are in play.

**14.** Specifically, the policy states: "Only [AXA Equitable's] Chairman of the Board, [its] President or one of [its] Vice Presidents can modify this contract or waive any of [AXA Equitable's] rights or requirements under it. The person making these changes must put them in writing and sign them."

equal and ample opportunity to prevent it and yet made it possible through the failure to exercise due diligence." *Hartsfield v. Union City Chrysler–Plymouth,* 218 Ga. App. 873, 463 S.E.2d 713, 716 (1995).

■ Georgia law is well settled that "a party to a contract who can read must read, or show a legal excuse for not doing so, and that fraud which will relieve a party who can read must be *such as prevents him from reading.*" *Ledford v. Smith,* 274 Ga.App. 714, 618 S.E.2d 627, 637 (2005) (quoting *Cox v. Smith,* 244 Ga. 280, 260 S.E.2d 310, 313 (1979) (emphasis added) (internal punctuation omitted)); *see also Novare Grp., Inc. v. Sarif,* 290 Ga. 186, 718 S.E.2d 304, 308 (2011) ("[T]he only type of fraud that can relieve a party of his obligation to read a written contract and be bound by its terms is a fraud that prevents the party from reading the contract.").

■ Indeed, where written contracts are concerned, the plaintiff's "blind reliance" on the defendant's statements about the contract's terms "shows a lack of due diligence which is unjustified as a matter of law." *Hartsfield,* 463 S.E.2d at 716; *see also Pampattiwar v. Hinson,* 326 Ga.App. 163, 756 S.E.2d 246, 250–51 (2014) ("Blind reliance precludes a fraud claim as a matter of law." (quoting *Baxter v. Fairfield Fin. Servs., Inc.,* 307 Ga.App. 286, 704 S.E.2d 423, 430 (2010) (internal quotation marks omitted))).

The trust contends that its fraud claim is not "factually implausible" and that after discovery it may be able to show that it is entitled to relief. The trust thus concludes that its fraud claim should survive AXA's motion to dismiss. As support for its theory, the trust cites an unpublished Middle District of Georgia case where the court denied the defendant's Rule 12(b)(6) motion because the complaint set forth facts that "with the aid of discovery and a more developed record" could state a claim for fraud. *See Stimus v. CitiMortgage, Inc.,* No. 5:10–cv–435(MTT), 2011 WL 2610391, at *5 (M.D.Ga. July 1, 2011).

But *Stimus* cannot save the trust's fraud claim. There, the bank allegedly misrepresented that the plaintiff's loan modification had been approved and that it would forestall foreclosing on her property. While such claims are typically barred by Georgia's statute of frauds, *see Sheely v. Bank of Am., N.A.,* 36 F.Supp.3d 1364, 1373–74, 2014 WL 3893019, at *7 (N.D.Ga. 2014), the *Stimus* court explained that with the benefit of discovery the plaintiff's allegations "could support a theory of part performance or equitable estoppel, and therefore preclude application of a statute of frauds defense," 2011 WL 2610391, at *5. The court thus declined to find that the plaintiff's fraud claim failed as a matter of law. *Id.*

■ Here, however, the trust has pleaded no facts suggesting that discovery could permit it to show justifiable reliance. Nothing in its complaint or opposition brief suggests that the trust was precluded from reading the policy. Indeed, the complaint strongly suggests that the trust blindly relied on AXA's representations that the annual premium would remain flat. Such reliance is unreasonable as a matter of law because the policy unambiguously contradicts these statements.

This is no less true just because AXA allegedly made false statements that the annual premium was "guaranteed" to remain $88,000 after the policy was delivered. The trust concludes that page six of the February 2006 illustration is proof of this allegedly false statement. It is not.

The trust's contention treats the policy and the February 2006 illustration as though they are on the same plane. They are not. Indeed, page six of the

February 2006 illustration could not be clearer: "THIS ILLUSTRATION IS NOT PART OF THE LIFE INSURANCE POLICY OR CONTRACT." [15] The controlling document, therefore, is the policy, which unambiguously provides that the annual premium may be insufficient to keep the policy in force.[16]

Lastly, the trust has not alleged that the February 2006 illustration, which Hovakimian allegedly signed, modified the policy. Nor could it. Nothing in the complaint suggests that Hovakimian was senior corporate officer or director of AXA Equitable; thus, the policy's modification clause bars the trust from claiming that page six of the February 2006 illustration constitutes a modification of the policy.

For these reasons, the trust cannot establish that it justifiably relied on AXA's allegedly false postdelivery statements, so its fraud claim fails on the merits.[17]

### C. Reformation

▉ Georgia law permits courts to equitably reform a contract to correct "an instrument to make it express the true intention of the parties, where from some cause, such as fraud, accident, or mistake, it does not express such intention." *Lee v. Am. Cent. Ins. Co.*, 241 Ga.App. 650, 530 S.E.2d 727, 730 (1999). This remedy, how-ever, does not permit the Court to draft a different contract for the parties. *Id.*

Here, the trust does not aver that the policy fails to capture the parties' true intention because of an accident or mistake. Instead, the trust alleges only that the policy was the product of fraud and thus should be reformed to conform to the trust's understanding that the policy would not lapse so long as the planned periodic premium of $88,000 was paid. But having found that the trust's fraud claim fails as a matter of law, the Court cannot grant the trust's request for reformation.

### IV. Conclusion

Accordingly, AXA's motion to dismiss for failure to state a claim [3] is GRANTED. Defendants AXA Equitable and AXA Advisors are DROPPED as parties to this action. And if Defendant Hovakimian has not been served by October 15, 2014, *see* [17], this action will be dismissed.

▉

---

15. Page six also disclaims that "THIS ILLUSTRATION IS NOT COMPLETE WITHOUT ALL NUMBERED PAGES." Yet the trust's exhibit includes only one of its twelve pages.

16. The policy provides that AXA "will give [the trust] an illustration of the potential future benefits under this policy, based upon both guaranteed and current cost factor assumptions." In other words, the policy is clear that the illustration will be based on the *unlikely* assumption that the monthly costs that must be paid to keep the policy from lapsing, including the cost of insuring Claude, will remain at their current levels. The unlikelihood of this is reiterated on page six of the February 2006 illustration, which Cynthia signed: "I ... understand that any non-guaranteed elements illustrated are subject to change; this illustration assumes that non-guaranteed elements remain unchanged for all years shown, and because this is not likely to occur, actual results could be either higher or lower."

17. Having determined that the trust's fraud claim fails on the merits, the Court need not address AXA's argument that it was barred by Georgia's four-year statute of limitations applicable to fraud claims.